UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

RECEIVED
JUL 23 2024
AT 8:30 ___ M
CLERK, U.S. DISTRICT COURT - DNJ

UNITED STATES OF AMERICA

v.

JAMES HYRES;
DENNIS MCMICKLE;
KEITH OPALENIK; and
EDWARD TROST III

Hon. Tonianne J. Bongiovanni

Mag. No. 24-3025 (TJB)

**CRIMINAL COMPLAINT**

I, Silvana Sotillo, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this Complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached pages and made a part hereof.

/s/ Silvana Sotillo
_____
Silvana Sotillo, Special Agent
Federal Bureau of Investigation

Attested to by telephone pursuant to
Fed. R. Crim. P. 4.1(b)(2)(A)
on July 23, 2024,
in the District of New Jersey

Hon. Tonianne J. Bongiovanni
United States Magistrate Judge
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

## **ATTACHMENT A**

<u>COUNT ONE</u>
(Conspiracy to Traffic in Firearms)

From in or around April 2024 to in or around May 2024, in Ocean County, in the District of New Jersey and elsewhere, the defendants,

JAMES HYRES,
DENNIS MCMICKLE,
KEITH OPALENIK, and
EDWARD TROST, III,

did knowingly and intentionally conspire and agree with each other and others to transfer and otherwise dispose of firearms to another person in and otherwise affecting interstate and foreign commerce, knowing and having reasonable cause to believe that the use, carrying, and possession of the firearm by the recipient would constitute any offense under Federal or State law punishable by imprisonment for a term exceeding one year, contrary to Title 18, United States Code, Section 933(a)(1).

In violation of Title 18, United States Code, Section 933(a)(3).

## COUNT TWO
(Felon in Possession of a Firearm)

On or about January 23, 2024, in Ocean County, in the District of New Jersey and elsewhere, the defendant,

DENNIS MCMICKLE,

knowing that he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year in a court in the State of New Jersey, did knowingly possess a firearm, namely, a Taurus, Model PT111 G2, 9-millimeter semi-automatic handgun, bearing serial number TKN17977, and the firearm was in and affecting commerce.

In violation of Title 18, United States Code, Section 922(g)(1).

## COUNT THREE
(Trafficking in Firearms)

On or about April 15, 2024, in Ocean County, in the District of New Jersey and elsewhere, the defendants,

**DENNIS MCMICKLE, and**
**KEITH OPALENIK,**

did knowingly transfer and otherwise dispose of a firearm, namely, a Ruger .22 caliber semi-automatic rifle, with an obliterated serial number, to another person in and otherwise affecting interstate and foreign commerce, knowing and having reasonable cause to believe that the use, carrying, and possession of the firearm by the recipient would constitute any offense under Federal or State law punishable by imprisonment for a term exceeding one year, namely, unlawful possession of a firearm with an obliterated serial number, contrary to Title 18, United States Code, Section 922(k), and unlawful purchase and receipt of a defaced firearm, contrary to N.J.S.A. 2C:39-9(e).

In violation of Title 18, United States Code, Sections 933(a)(1) and 2.

## COUNT FOUR
(Unlawful Possession of a Firearm with an Obliterated Serial Number)

On or about April 15, 2024, in Ocean County, in the District of New Jersey and elsewhere, the defendants,

> DENNIS MCMICKLE, and
> KEITH OPALENIK,

did knowingly possess a firearm, namely, a Ruger .22 caliber semi-automatic rifle, which had the importer's and manufacturer's serial number removed, obliterated, and altered, and which had been shipped and transported in interstate and foreign commerce.

In violation of Title 18, United States Code, Sections 922(k).

<u>COUNT FIVE</u>
(Felon in Possession of a Firearm)

On or about May 7, 2024, in Ocean County, in the District of New Jersey and elsewhere, the defendant,

DENNIS MCMICKLE, and
JAMES HYRES,

knowing that they each had previously been convicted of a crime punishable by imprisonment for a term exceeding one year in a court in the State of New Jersey, did knowingly possess firearms, namely, (i) a Remington, Model 1100 LT-20, 20-gauge shotgun, bearing serial number N929587K, and (ii) a Remington, Model 870 Wingmaster, 12-gauge shotgun, bearing serial number T735033V, and the firearms were in and affecting commerce.

In violation of Title 18, United States Code, Section 922(g)(1) and 2.

## COUNT SIX
(Trafficking in Firearms)

On or about May 16, 2024, in Ocean County, in the District of New Jersey and elsewhere, the defendants,

JAMES HYRES, and
EDWARD TROST III,

did knowingly transfer or otherwise dispose of a firearm, namely, a Remington, Model 870 Express Magnum, 20-gauge shotgun bearing serial number D391383U, to another person in and otherwise affecting interstate and foreign commerce, knowing and having reasonable cause to believe that the use, carrying, and possession of the firearm by the recipient would constitute any offense under Federal or State law punishable by imprisonment for a term exceeding one year, namely, unlawful possession of a firearm by a previously convicted felon, contrary to Title 18, United States Code, Section 922(g)(1), and unlawful possession of a firearm, contrary to N.J.S.A. 2C:39-5(c).

In violation of Title 18, United States Code, Sections 933(a)(1) and 2.

## COUNT SEVEN
(Felon in Possession of a Firearm)

On or about May 16, 2024, in Ocean County, in the District of New Jersey and elsewhere, the defendant,

JAMES HYRES,

knowing that he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year in a court in the State of New Jersey, did knowingly possess a firearm, namely, a Remington, Model 870 Express Magnum, 20-gauge shotgun, bearing serial number D391383U, and the firearm was in and affecting commerce.

In violation of Title 18, United States Code, Section 922(g)(1).

## ATTACHMENT B

I, Silvana Sotillo, am a Special Agent with the Federal Bureau of Investigation ("FBI"). I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents and other items of evidence. Where statements of others are related herein, they are related in substance and part. Because this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

### I. BACKGROUND

1. Since in or around January 2024, law enforcement has been investigating a firearms-trafficking network, which includes defendants JAMES HYRES ("HYRES"), DENNIS MCMICKLE ("MCMICKLE"), KEITH OPALENIK ("OPALENIK"), and EDWARD TROST, III ("TROST"), and which operates in and around Ocean County, New Jersey and elsewhere.

2. Multiple confidential sources of information assisted law enforcement during this investigation, including by conducting controlled purchases of firearms and ammunition from members of the conspiracy, including HYRES, MCMICKLE, OPALENIK, and TROST. The information and assistance provided during the investigation by the confidential sources has been corroborated through other evidence law enforcement has obtained, including consensually recorded telephone communications and in-person meetings with the defendants, physical surveillance, and other investigative techniques.

3. Law enforcement's investigation has revealed the manner and means by which members of the conspiracy carried out the organization's unlawful firearms trafficking activities. HYRES illegally traffics firearms, including traditional firearms and privately made firearms ("PMFs")[1], also known as "ghost guns." HYRES manufactures PMFs for resale using various component parts, including firearm frames manufactured by HYRES using a 3D printer. In furtherance of the firearms trafficking conspiracy, MCMICKLE and TROST assisted HYRES by arranging unlawful firearms transactions between HYRES and a confidential source working at the direction and supervision of law enforcement (hereafter, the "CS"). In furtherance of the

---

[1] A "privately made firearm" or "PMF" is a firearm, including a frame or receiver, assembled or otherwise produced by a person other than a licensed manufacturer, and without a serial number or other identifying markings placed by a licensed manufacturer at the time the firearm was produced.

9

conspiracy, MCMICKLE also arranged an unlawful firearm transaction between OPALENIK (as the seller) and the CS (as the buyer).

4.     During the investigation, between in or around January 2024 and in or around May 2024, law enforcement conducted numerous controlled purchases of firearms from members of the firearms trafficking conspiracy, as summarized in the chart below. All these controlled purchases were recorded by the CS using a covert audio and video recording device supplied by law enforcement.

| Date | Defendant(s) Involved in Selling Firearm(s) | Firearm(s) Purchased |
|---|---|---|
| 1/23/2024 | MCMICKLE | Taurus, Model PT111 G2, 9-millimeter semi-automatic pistol, bearing serial number TKN17977 |
| 4/15/2024 | MCMICKLE, OPALENIK | Ruger .22 caliber semi-automatic rifle with an obliterated serial number |
| 4/30/2024 | MCMICKLE, HYRES | Two privately manufactured 9-millimeter semi-automatic handguns |
| 5/7/2024 | MCMICKLE, HYRES | Remington, Model 1100 LT-20, 20-gauge shotgun, bearing serial number N929587K<br><br>Ross Rifle Company .303 caliber Rifle, manufactured without a serial number<br><br>Remington, Model 870 Wingmaster, 12-gauge shotgun, bearing serial number T735033V |
| 5/16/2024 | TROST, HYRES | Four privately manufactured 9-millimeter semi-automatic handguns<br><br>Remington, Model 870 Express Magnum, 20-gauge shotgun, bearing serial number D391383U |

5.  At all times relevant to this complaint, none of the defendants is or ever was a federally licensed dealer, importer, or manufacturer of firearms. In fact, HYRES, MCMICKLE and TROST are previously convicted felons and, therefore, prohibited from possessing a firearm under federal law.

## II. CONTROLLED PURCHASES OF FIREARMS

### A. The January 23, 2024 Firearm Sale

6.  On or about January 23, 2024, the CS contacted MCMICKLE and made arrangements to meet with MCMICKLE for the purpose of purchasing a firearm from MCMICKLE for approximately $600. Prior to the transaction, law enforcement met the CS at a predetermined location where they searched the CS and the CS's vehicle for contraband and currency with negative results. Law enforcement also provided the CS with the necessary funds to make the controlled purchase and equipped the CS with a covert audio and video recording device to record the transaction with MCMICKLE.

7.  Thereafter, the CS drove to MCMICKLE's residence in or around Brick Township, New Jersey, for the firearm transaction, and met with MCMICKLE inside the residence. While inside the residence, the CS handed MCMICKLE the money that law enforcement had provided for the controlled purchase and, in exchange, MCMICKLE handed the CS a Taurus, model PT111 G2, 9-millimeter semi-automatic handgun bearing serial number TKN17977 (the "Taurus Handgun") and approximately 44 rounds of 9-millimeter ammunition.

8.  Following the controlled purchase of the Taurus Handgun, the CS departed MCMICKLE's residence and proceeded directly to a prearranged location where he/she again met with law enforcement. The CS provided law enforcement with the recording device, the Taurus Handgun, and the ammunition he/she had purchased from MCMICKLE.

9.  Law enforcement subsequently submitted the Taurus Handgun to a law enforcement laboratory for analysis, where it was test fired and found to be operable.

10. The Taurus Handgun was manufactured outside the State of New Jersey and, therefore, traveled in interstate commerce prior to MCMICKLE's possession thereof in New Jersey on or about January 23, 2024.

### B. The April 15, 2024 Firearm Sale

11. On or about April 15, 2024, MCMICKLE sent the CS a text message with a photograph of a firearm that MCMICKLE offered to sell to the CS for approximately $1,500. The CS, acting at the direction of law

enforcement, agreed to purchase the firearm from MCMICKLE and made arrangements to meet with MCMICKLE for the transaction later that same date.

12. Prior to the transaction, law enforcement met the CS at a predetermined location where they searched the CS and the CS's vehicle for contraband and currency. The search revealed no contraband, but law enforcement discovered that the CS had in his/her possession a specific amount of U.S. currency, which law enforcement temporarily held in its custody until the completion of the controlled purchase operation. Law enforcement then provided the CS with the necessary funds to make the controlled purchase and equipped the CS with a covert audio and video recording device to record the transaction.

13. Thereafter, the CS drove to a particular residence in Toms River, New Jersey, where MCMICKLE was waiting for the CS. MCMICKLE entered the front passenger seat of the CS's vehicle and instructed the CS to drive to a particular residence in or around Ocean Gate, New Jersey, where the CS and MCMICKLE were to meet with the seller, who was later identified by law enforcement as OPALENIK. Upon their arrival at OPALENIK's residence, MCMICKLE exited the CS's vehicle and entered OPALENIK's residence. A short time later, MCMICKLE exited OPALENIK's residence and approached the front driver's side window of the CS's vehicle. MCMICKLE advised the CS that OPALENIK was not ready to sell the firearm that the CS originally agreed to purchase, but noted that OPALENIK had another firearm to sell to the CS. After negotiating a purchase price for the new firearm with the CS, MCMICKLE walked back inside OPALENIK's residence.

14. A short time later, both MCMICKLE and OPALENIK, who was carrying a rifle case, exited OPALENIK's residence and approached the CS's vehicle. OPALENIK entered the back seat of the CS's vehicle, while MCMICKLE stood outside the CS's vehicle next the front driver's side door. OPALENIK unzipped the firearm case and showed the CS what was later identified as a RUGER .22 caliber semi-automatic rifle with an obliterated serial number (the ".22 Caliber Rifle"), at which time MCMICKLE advised that he (MCMICKLE) had just removed the serial number from the .22 Caliber Rifle. OPALENIK also advised the CS that he would have additional firearms to sell to the CS in the future and described the types of firearms that he expected to receive soon. After examining the .22 Caliber Rifle, the CS handed MCMICKLE approximately $800 of the money that law enforcement had provided for the controlled purchase. OPALENIK then exited the CS's vehicle, leaving the .22 Caliber Rifle inside the CS's vehicle, and OPALENIK and MCMICKLE walked back inside OPALENIK's residence. A short time later, MCMICKLE exited OPALENIK's residence and entered the front passenger seat of the CS's vehicle.

15.     Following the transaction, the CS and MCMICKLE departed OPALENIK's residence in the CS's vehicle. During the drive, MCMICKLE again advised the CS that he (MCMICKLE) had removed the serial number from the .22 Caliber Rifle with a tool while inside OPALENIK's residence and stated that he had done so at OPALENIK's request. The CS dropped MCMICKLE off at a convenience store in or around Beachwood, New Jersey, and then proceeded directly to a prearranged location where he/she again met with law enforcement. The CS provided law enforcement with the remainder of the unused funds that law enforcement had provided for the controlled purchase, the recording device, and the .22 Caliber Rifle that the CS had purchased from MCMICKLE and OPALENIK.

16.     Law enforcement subsequently submitted the .22 Caliber Rifle to a law enforcement laboratory, where the serial number was restored to read 0011-57714. In addition, the .22 Caliber Rifle was test fired and found to be operable.

17.     The .22 Caliber Rifle was manufactured outside the State of New Jersey and, therefore, traveled in interstate commerce prior to MCMICKLE and OPALENIK's possession thereof on or about April 15, 2024.

### C.    The April 30, 2024 Firearms Sales

18.     On or about April 30, 2024, at law enforcement's direction, the CS contacted MCMICKLE and made arrangements to meet with MCMICKLE for the purpose of purchasing a firearm from MCMICKLE for approximately $1,100.

19.     Prior to the transaction, law enforcement met the CS at a predetermined location where they searched the CS and the CS's vehicle for contraband and currency. The search revealed no contraband, but law enforcement discovered that the CS had in his/her possession a specific amount of U.S. currency, which law enforcement temporarily held in its custody until the completion of the controlled purchase operation. Law enforcement then provided the CS with the necessary funds to make the controlled purchase and equipped the CS with a covert audio and video recording device to record the transaction.

20.     Thereafter, the CS drove to a particular commercial establishment located in the area of Route 37 in Toms River, New Jersey, where MCMICKLE was waiting for the CS. MCMICKLE entered the front passenger seat of the CS's vehicle and instructed the CS to drive to a particular location in or around Toms River (hereafter, "Meeting Location-1"), where the CS and MCMICKLE were prepared to meet with the seller, who was later identified by law enforcement as HYRES.

21. During the drive to Meeting Location-1, MCMICKLE advised the CS that HYRES manufactures firearms inside the basement of HYRES's residence, and that MCMICKLE had been present in HYRES's basement the previous evening and had seen HYRES's firearms manufacturing operation, including numerous component parts of firearms and several partially assembled firearms. MCMICKLE also advised the CS that he (MCMICKLE) was a four-time convicted felon and that MCMICKLE expected to receive a portion of the proceeds from HYRES's sale of the firearm to the CS.

22. Upon arriving at Meeting Location-1, the CS parked his/her vehicle, as the CS and MCMICKLE waited for HYRES to arrive. Approximately thirteen minutes later, HYRES arrived at Meeting Location-1 driving a Jeep Cherokee bearing New Jersey license plates (hereafter, the "Jeep"), and parked near the CS's vehicle. MCMICKLE then exited the CS's vehicle, approached HYRES's Jeep, and met with HYRES. Shortly thereafter, MCMICKLE returned to the CS's vehicle carrying a tan colored handgun case. MCMICKLE handed the handgun case to the CS and, in exchange, the CS handed MCMICKLE the money that law enforcement had provided for the controlled purchase. The CS opened the handgun case and examined its contents, which included a privately manufactured 9-millimeter semi-automatic handgun with no serial number and an extended magazine. MCMICKLE advised the CS that the handgun had no serial number because HYRES had manufactured the handgun using a 3D printer. MCMICKLE then exited the CS's vehicle, entered the front passenger seat of HYRES's Jeep, and departed the area with HYRES.

23. Following the transaction with MCMICKLE and HYRES, the CS proceeded directly to a prearranged location where he/she again met with law enforcement. The CS provided law enforcement with the recording device, and the PMF that the CS had purchased from MCMICKLE and HYRES. Law enforcement again searched the CS's person and vehicle for contraband and currency with negative results.

24. Later that same date, MCMICKLE contacted the CS and advised that he and HYRES had another handgun available to sell to the CS for approximately $800. The CS, at the direction of law enforcement, agreed to purchase this firearm. Prior to the transaction, law enforcement met the CS at a predetermined location where they searched the CS and the CS's vehicle for contraband and currency with negative results. Law enforcement also provided the CS with the necessary funds to make the controlled purchase and equipped the CS with a covert audio and video recording device to record the transaction.

25. Thereafter, the CS drove to a particular commercial establishment located in the area of Route 37 in Toms River, New Jersey, where MCMICKLE was waiting for the CS. MCMICKLE entered the front passenger seat of the CS's vehicle and the CS drove to Meeting Location-1, where HYRES was waiting in the Jeep. Upon arriving at Meeting Location-1, the CS parked his/her vehicle

near HYRES's Jeep, at which time MCMICKLE exited the CS's vehicle and approached HYRES's Jeep.

26. A few seconds later, MCMICKLE returned to the CS's vehicle carrying a dark colored handgun case. MCMICKLE handed the handgun case to the CS. Upon inspecting the contents of the handgun case, the CS and MCMICKLE discovered that it contained unassembled firearms parts. MCMICKLE then exited the CS's vehicle with the handgun case and approached HYRES's Jeep. Less than a minute later, MCMICKLE returned to the CS's vehicle. MCMICKLE explained that HYRES mistakenly brought the wrong handgun case, and that HYRES was going back to his residence and would return with the firearm the parties had agreed to sell in a few minutes.

27. Approximately twelve minutes later, HYRES returned to Meeting Location-1 driving the Jeep and parked near the CS's vehicle, at which time MCMICKLE exited the CS's vehicle and approached the Jeep. A few seconds later, MCMICKLE returned to the CS's vehicle carrying a dark colored hard plastic handgun case. MCMICKLE handed the handgun case to the CS. The CS opened the handgun case and inspected its contents, which included a privately manufactured 9-millimeter semi-automatic handgun with no serial number. The CS then handed MCMICKLE the money that law enforcement had provided for the controlled purchase. Thereafter, MCMICKLE exited the CS's vehicle, entered the front passenger seat of HYRES's Jeep, and departed the area with HYRES.

28. Following the transaction with MCMICKLE and HYRES, the CS proceeded directly to a prearranged location where he/she again met with law enforcement. The CS provided law enforcement with the recording device, and the PMF that the CS had purchased from MCMICKLE and HYRES. Law enforcement again searched the CS's person and vehicle for contraband and currency with negative results.

29. Law enforcement subsequently submitted the two PMFs to a law enforcement laboratory for analysis, where both PMFs were test fired and found to be operable.

**D.   The May 7, 2024 Firearms Sales**

30. On or about May 6, 2024, MCMICKLE contacted the CS, advised that he and HYRES had two firearms available for sale for approximately $3,000, and sent photographs of the two firearms – a shotgun and a rifle – via text message to the CS. The CS, at the direction of law enforcement, agreed to purchase the two firearms from MCMICKLE and HYRES and made arrangements to meet MCMICKLE and HYRES the next day for the transaction.

31. Prior to the transaction, on or about May 7, 2024, law enforcement met the CS at a predetermined location where they searched the CS and the CS's vehicle for contraband and currency with negative results. Law enforcement also provided the CS with the necessary funds to make the controlled purchase and equipped the CS with a covert audio and video recording device to record the transaction.

32. Thereafter, the CS drove to a particular apartment complex in Toms River, New Jersey, where MCMICKLE was waiting for the CS. MCMICKLE entered the front passenger seat of the CS's vehicle and instructed the CS to drive to Meeting Location-1. During the drive to Meeting Location-1, MCMICKLE advised the CS that HYRES had a third firearm, a 12-gauge shotgun, available for sale. The CS advised MCMICKLE that he/she was also interested in purchasing the third firearm, and asked MCMICKLE to find out if HYRES would accept approximately $500 for the third firearm.

33. Upon arriving at Meeting Location-1, the CS parked his/her vehicle and the CS and MCMICKLE waited for HYRES to arrive. A short time later, HYRES arrived driving the Jeep and parked near the CS's vehicle, at which time MCMICKLE exited the CS's vehicle and approached HYRES's Jeep. Shortly thereafter, MCMICKLE returned to the CS's vehicle and advised the CS that HYRES brought all three firearms to sell to the CS. The CS again advised MCMICKLE that he/she was interested in purchasing the third firearm but explained that he/she only brought enough money to pay for the two firearms that the CS had originally agreed to purchase from MCMICKLE and HYRES. The CS asked if he/she could purchase the third firearm from MCMICKLE and HYRES later that same date. MCMICKLE then walked back over to the Jeep and spoke with HYRES.

34. Approximately one minute later, MCMICKLE returned to the CS's vehicle and instructed the CS to move his/her vehicle to the parking spot next to HYRES's Jeep so that MCMICKLE could transfer two of the firearms from HYRES's Jeep to the CS's vehicle. The CS parked his/her vehicle in the parking spot beside HYRES's Jeep as instructed. MCMICKLE then removed two firearms – a Remington, model 1100 LT-20, 20-gauge shotgun bearing serial number N929587K (the "First Remington Shotgun"), and a Ross Rifle Company .303 caliber bolt-action rifle, manufactured without a serial number (the ".303 Caliber Rifle") – from HYRES's vehicle and placed them into the CS's vehicle. Thereafter, MCMICKLE entered the front passenger seat of the CS's vehicle, at which time the CS handed MCMICKLE the money that law enforcement had provided for the controlled purchase. MCMICKLE also informed the CS that he and HYRES would meet the CS later that same day to sell the third firearm to the CS. The CS advised MCMICKLE that he/she would pick up the money to purchase the third firearm shortly. MCMICKLE then exited the CS's vehicle, entered the front passenger seat of HYRES's Jeep, and departed the area with HYRES.

35. Following the transaction with MCMICKLE and HYRES, the CS proceeded directly to a prearranged location where he/she again met with law enforcement. Law enforcement again searched the CS and the CS's vehicle for contraband and currency with negative results. The CS provided law enforcement with the recording device, as well as the First Remington Shotgun and the .303 Caliber Rifle that the CS had purchased from MCMICKLE and HYRES. In addition, the CS advised law enforcement that MCMICKLE and HYRES offered to sell the CS a third firearm for $500 later that same date.

36. The First Remington Shotgun was manufactured outside the State of New Jersey and, therefore, traveled in interstate commerce prior to MCMICKLE and HYRES's possession of the First Remington Shotgun on or about May 7, 2024.

37. Approximately fifteen minutes later, at law enforcement's direction, the CS sent a text message to MCMICKLE advising that the CS now had the money to purchase the third firearm from MCMICKLE and HYRES. MCMICKLE instructed the CS to meet him and HYRES for the transaction at a particular location in Toms River, New Jersey (hereafter, "Meeting Location-2"). Law enforcement then provided the CS with the necessary funds to purchase the shotgun from MCMICKLE and HYRES and equipped the CS with a covert audio and video recording device to record the transaction.

38. The CS then drove to Meeting Location-2, where MCMICKLE was waiting. Shortly thereafter, HYRES arrived at Meeting Location-2 in the Jeep and parked close to the CS's vehicle. The CS exited his/her vehicle and approached HYRES's Jeep, where the CS met with MCMICKLE outside of HYRES's Jeep and handed MCMICKLE the money that law enforcement had provided for the controlled purchase. The CS then retrieved a long cardboard box – containing a Remington, Model 870 Wingmaster, 12-gauge shotgun bearing serial number T735033V (the "Second Remington Shotgun") – from the rear driver's side floorboard of HYRES's Jeep and placed it inside the rear passenger compartment of the CS's vehicle. The CS then entered his/her vehicle and departed the area.

39. Following the transaction with MCMICKLE and HYRES, the CS proceeded directly to a prearranged location where he/she again met with law enforcement. Law enforcement again searched the CS's person and vehicle for contraband and currency with negative results. The CS provided law enforcement with the recording device and the Second Remington Shotgun that the CS had purchased from MCMICKLE and HYRES.

40. The Second Remington Shotgun was manufactured outside the State of New Jersey and, therefore, traveled in interstate commerce prior to

HYRES's possession of the Second Remington Shotgun on or about May 7, 2024.

41. Law enforcement subsequently submitted the First Remington Shotgun, the Second Remington Shotgun, and the .303 Caliber Rifle to a law enforcement laboratory for analysis, where all three firearms were test fired and found to be operable.

### E. The May 16, 2024 Firearms Sales

42. On or about May 16, 2024, at the direction of law enforcement, the CS communicated with TROST and made arrangements to meet TROST and HYRES at TROST's residence in Toms River, New Jersey, for the purpose of purchasing four semi-automatic handguns from TROST and HYRES for approximately $3,500.

43. Prior to the transaction, law enforcement met the CS at a predetermined location where they searched the CS and the CS's vehicle for contraband and currency. The search revealed no contraband, but law enforcement discovered that the CS had in his/her possession a specific amount of U.S. currency, which law enforcement temporarily held in its custody until the completion of the controlled purchase operation. Law enforcement then provided the CS with the necessary funds to make the controlled purchase and equipped the CS with a covert audio and video recording device to record the transaction.

44. Thereafter, the CS drove to TROST's residence and met with TROST. A short time later, HYRES arrived at TROST's residence and met with TROST and the CS. HYRES provided the CS with two hard plastic handgun cases, each containing two privately manufactured 9-millimeter semi-automatic handguns with no serial numbers. In addition, HYRES provided the CS with approximately 50 12-gauge shotgun shells and approximately 75 rounds of 9-millimeter ammunition. In exchange for the four privately manufactured handguns and the ammunition, the CS handed HYRES the money that law enforcement had provided for the controlled purchase.

45. During the transaction, HYRES also produced a Remington, model 870 Express Magnum, 20-gauge shotgun, bearing serial number D391383U (the "Third Remington Shotgun"), which HYRES offered to sell to the CS for approximately $900. The CS agreed to purchase the Third Remington Shotgun but advised HYRES that he/she had only brought enough money to purchase the four handguns from HYRES and TROST. HYRES agreed to allow the CS to take the Third Remington Shotgun and pay HYRES and TROST for it later. HYRES also offered to sell the CS more ammunition in the future. The CS responded that he/she was interested in obtaining ammunition from HYRES in the future because, as the CS explained to HYRES and TROST, the CS could

not lawfully purchase ammunition due to the CS's status as a previously convicted felon. HYRES advised the CS that he would provide the CS with more ammunition when the CS returned to pay HYRES and TROST for the shotgun. TROST and the CS then gathered the firearms and ammunition that the CS purchased from TROST and HYRES and placed the firearms and ammunition inside the CS's vehicle. Thereafter, the CS entered his/her vehicle and departed the area.

46.  Following the transaction with TROST and HYRES, the CS proceeded directly to a prearranged location where he/she again met with law enforcement. Law enforcement again searched the CS's person and vehicle for contraband and currency with negative results. The CS provided law enforcement with the recording device, as well as the four PMFs, the Third Remington Shotgun, and the ammunition that the CS had purchased from HYRES and TROST. Law enforcement subsequently submitted the four PMFs and the Third Remington Shotgun to a law enforcement laboratory for analysis, where each of the firearms was test fired. The Third Remington Shotgun and three of the PMFs were found to be operable.

47.  The Third Remington Shotgun was manufactured outside the State of New Jersey and, therefore, traveled in interstate commerce prior to HYRES's possession of the Third Remington Shotgun on or about May 16, 2024.

48.  I have reviewed the relevant criminal history records for HYRES. On or about December 11, 2007, HYRES was convicted in the Superior Court of New Jersey, Ocean County, of second-degree possession of a firearm while in the course of committing a controlled dangerous substance ("CDS") offense, in violation of N.J.S.A. 2C:39-4.1(a), and third-degree distribution/possession with intent to distribute CDS, in violation of N.J.S.A. 2C:35-5, both of which are crimes punishable by imprisonment for a term exceeding one year. Convicted of these two offenses, HYRES was sentenced to a three-year term of imprisonment.

49.  I have reviewed the relevant criminal history records for MCMICKLE. On or about October 29, 2010, MCMICKLE was convicted in the Superior Court of New Jersey, Monmouth County, of first-degree robbery, in violation of N.J.S.A. 2C:15-1; third-degree distribution/possession with intent to distribute CDS, in violation of N.J.S.A. 2C:35-5; and fourth-degree unlawful possession of a prohibited weapon, in violation of N.J.S.A. 2C:39-3, all of which are crimes punishable by imprisonment for a term exceeding one year. Convicted of these three offenses, MCMICKLE was sentenced to a five-year term of imprisonment.

50.  I have reviewed the relevant criminal history records for TROST. On or about April 11, 2011, TROST was convicted in the Superior Court of New Jersey, Ocean County, of third-degree burglary, in violation of N.J.S.A. 2C:18-

2, and fourth-degree false reports to law enforcement, in violation of N.J.S.A. 2C:28-4(a), both of which are crimes punishable by imprisonment for a term exceeding one year. TROST initially received a probationary sentence for these convictions. However, TROST subsequently violated the terms and conditions of his probation and, on or about November 14, 2014, was resentenced to a three-year term of imprisonment. In addition, on or about December 8, 2014, TROST was convicted in the Superior Court of New Jersey, Monmouth County, of third-degree possession of CDS, in violation of N.J.S.A. 2C:35-10(a)(1), a crime punishable by imprisonment for a term exceeding one year, for which TROST received a sentence of three years' imprisonment.